IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

CHARLES McCORVEY,            )
                             )
        Plaintiff,           )
                             )
v.                           )        CIVIL ACTION 08-0151-WS-C
                             )
EARL SMITH,                  )
                             )
        Defendant.           )

## ORDER

This matter comes before the Court on defendant's Motion for Summary Judgment (doc. 36).  The Motion has been briefed and is ripe for disposition.

I.     **Background Facts.**[1]

This § 1983 false arrest action arises from events that transpired on the evening of March 24, 2006 in a residential area in Mobile, Alabama.  Plaintiff Charles McCorvey, a 60-year old African-American male, was driving to his residence on La Pine Drive between 8:00 p.m and 10:00 p.m., when his vehicle (a red 1998 Chevrolet Lumina) broke down because of a balky transmission.  (McCorvey Dep., at 22, 69, 75-76, 79.)[2]  McCorvey's vehicle coasted to a stop at

---

[1]      The Court is mindful of its obligation under Rule 56 to construe the record, including all evidence and factual inferences, in the light most favorable to the nonmoving party.  *See Skop v. City of Atlanta, GA*, 485 F.3d 1130, 1136 (11th Cir. 2007).   Thus, plaintiff's version of the facts is taken as true and all justifiable inferences are drawn in his favor.

[2]      Plaintiff has submitted McCorvey's entire 128-page deposition transcript as an exhibit.  (Doc. 41, at Exh. 1.)  Plaintiff has also filed complete copies of other deposition transcripts.  Large portions of these exhibits are not referenced in plaintiff's brief.  The filing of unexcerpted exhibits contravenes the Local Rules' directive that "[i]f discovery materials are germane to any motion or response, only the relevant portions of the material shall be filed with the motion or response."  LR 5.5(c).  Plaintiff's evidentiary submission will be accepted as filed; however, this Court will not exhaustively review the uncited portions, seeking out uncited evidence that may advance plaintiff's position.  *See, e.g., Preis v. Lexington Ins. Co.*, 508 F. Supp.2d 1061, 1068 (S.D. Ala. 2007) ("Parties may not, by the simple expedient of dumping a mass of evidentiary material into the record, shift to the Court the burden of identifying evidence supporting their respective positions.");  *Carolina Acquisition, LLC v. Double Billed, LLC*, --- F.

the edge of the roadway approximately four or five houses down the street from McCorvey's residence.  (*Id.* at 76-78.)  McCorvey attempted to restart the vehicle; however, it would not crank.  (*Id.* at 79.)  Because McCorvey's mechanic (a gentleman named Pookie) had advised him not to move the car if this problem occurred, but instead to call him, McCorvey remained seated in the vehicle and repeatedly attempted to reach Pookie via cell phone.  (*Id.* at 76-77, 80-81.)  By McCorvey's estimate, he sat in the parked Lumina for some 45 minutes at that location, but never got through to his mechanic.  To pass the time, McCorvey placed calls to other friends and acquaintances to discuss topics unrelated to the condition and repair of the vehicle.  (*Id.* at 80-81, 94-95.)

While these events were unfolding, a La Pine Drive resident named Deborah Roberts arrived at her house with her young son, only to see the Lumina parked nearby with McCorvey sitting inside.  (Roberts Aff., ¶ 2.)  Roberts did not know who McCorvey was or why he was parked close to her home.  (*Id.*)  Frightened, she called 9-1-1.  (*Id.*)  Roberts informed the 9-1-1 dispatcher about the situation, stating that she did not know who the man was, that he was not attempting to move the vehicle but was instead talking on a cell phone, that she intended to remain in her car until the police arrived, and that she was concerned that the stranger might have a gun or otherwise harbor criminal intentions.  (*Id.*, ¶ 3.)

That evening, defendant Earl Smith, who was at that time a six-year veteran of the Mobile Police Department, was on duty as a patrol officer in the Fourth Precinct, which encompasses La Pine Drive.  (Smith Dep., at 6.)  The dispatcher notified Officer Smith of Roberts' call, telling him that she was very upset because there was a stranger parked in front of her residence and that she would not go inside until the police arrived.  (*Id.* at 7.)  Officer Smith understood Roberts to be "scared to death."  (*Id.* at 14.)  So he proceeded to La Pine Drive, with Officer George Tolbert, who is not a party herein, assigned as backup.  (*Id.* at 7.)  Officer Smith

Supp.2d ----, 2009 WL 1298362, *2 (S.D. Fla. May 8, 2009) ("Federal judges are not archaeologists. ... We possess neither the luxury nor the inclination to sift through that mound of obfuscation in hopes of finding a genuine issue of material fact to deny summary judgment."); *Witbeck v. Embry Riddle Aeronautical University, Inc.*, 219 F.R.D. 540, 547 (M.D. Fla. 2004) ("That judges have no duty to scour the file in search of evidence is an obvious corollary to the requirement that parties specifically identify the portions of the case file which support their assertions regarding whether genuine issues remain for trial.").

reached La Pine Drive at approximately 9:30 p.m.  (McCorvey Dep., at 84.)  According to plaintiff, Officer Tolbert did not join Officer Smith at that location until at least 20 minutes later.  (*Id.*)

Upon turning onto La Pine Drive, Officer Smith observed McCorvey sitting in a parked vehicle talking on his cell phone.  (Smith Dep., at 7.)  The vehicle was not in a state of obvious distress or disability.  (*Id.* at 8.)  Officer Smith tapped on the Lumina's window and asked McCorvey for his name and driver's license.  (McCorvey Dep., at 82-83; Smith Dep., at 7.)  McCorvey immediately asked why he was being arrested, in response to which Officer Smith assured him that he was not under arrest and that Officer Smith was simply trying to determine who McCorvey was and what he was doing at that location.  (McCorvey Dep., at 83; Smith Dep., at 7-8.)  Officer Smith testified that this inquiry was for both McCorvey's safety and his own safety.  (Smith Dep., at 8.)  McCorvey handed Officer Smith his driver's license, which was issued in Florida.  (*Id.* at 7.)  According to McCorvey, Officer Smith next instructed him to exit the Lumina, at which time Officer Smith patted him down, handcuffed him, and placed him in the back seat of his patrol car.  (McCorvey Dep., at 83.)[3]  Although Officer Smith denies handcuffing McCorvey at that time (Smith Dep., at 8), McCorvey's narrative is accepted as true for purposes of the pending Rule 56 Motion.  Officer Smith testified that he placed McCorvey in his patrol car based on safety concerns because McCorvey's identity, activities and intentions were unknown; he had produced an out-of-state driver's license and had offered no explanation for his conduct; and he had displayed an uncooperative attitude.  (*Id.* at 12.)[4]

---

[3]    In his deposition, McCorvey took issue with the word "placed," insisting that Officer Smith did not "place" him in the car, but "forcefully put [him] into the back seat." (McCorvey Dep., at 83.)  There is no elaboration in the record as to how Officer Smith behaved "forcefully"; certainly, there is no indication that McCorvey sustained injuries during that process.  At any rate, McCorvey's "forcefully" word choice is largely academic inasmuch as he has not brought an excessive force claim.  Nonetheless, for what it is worth, McCorvey's characterization of Officer Smith's actions is accepted as true for summary judgment purposes.

[4]    All of these events were taking place in the context of Officer Smith's knowledge and experience.  As a patrol officer who regularly worked this neighborhood, Officer Smith knew it to be a "high crime area," which (in tandem with all of the other circumstances) caused him concern that a crime might have been or might be committed.  (*Id.* at 14.)

McCorvey testified that he spent approximately 40 minutes handcuffed and seated in Officer Smith's patrol vehicle. (McCorvey Dep., at 84.) During that time period, Officer Smith "did a lot of things," by McCorvey's reckoning. (*Id.* at 83.) Among other things, Officer Smith ran a license check, "talk[ed] to somebody on the phone," spoke at length with Officer Tolbert when the latter arrived, waited while Officer Tolbert went down the street to get McCorvey's wife, talked to McCorvey's wife when she arrived on the scene, and finally released McCorvey from the patrol vehicle. (*Id.* at 83-86, 91-93.) Officer Smith's account of his activities was similar. According to Officer Smith, he ran a background check of McCorvey by radio, which (after a period of several minutes) revealed no outstanding warrants. (Smith Dep., at 8.) He also ran the tag on the Lumina, which revealed that it was a registered to a female named Christine Stewart, who lived several houses away on La Pine Drive. (*Id.* at 9.) Officer Smith did not know that Stewart was McCorvey's wife, so he sent Officer Tolbert to the residence to inquire about the Lumina. (*Id.*) It was then that the officers learned of Stewart's relationship to McCorvey. (*Id.*) Stewart told the officers that she did not know why her husband had been sitting in the Lumina parked down the street. (*Id.*) Nonetheless, Stewart put on her shoes and accompanied Officer Tolbert back to the scene, where McCorvey was still sitting in the back of the patrol car. (Stewart Dep., at 16, 26-27.) When Stewart arrived, Officer Smith released McCorvey and instructed him to move the Lumina. (*Id.* at 27; McCorvey Dep., at 122-23.) The officers then left the immediate area.[5]

---

[5]     This was not the conclusion of the incident, but what happened thereafter is not germane to any remaining causes of action herein or to the pending Motion for Summary Judgment. McCorvey testified that after he was released from Officer Smith's vehicle, both officers moved some distance down the street, while McCorvey and Stewart attempted unsuccessfully to restart the Lumina. (McCorvey Dep., at 87, 123-24.) After 15-30 minutes, the officers returned and directed him either to move the Lumina himself or to allow them to push it to his house. (*Id.*) McCorvey refused both options, after which Officer Smith placed him under arrest for failing to obey an officer. (*Id.* at 87, 124-25; Smith Dep., at 9-10.) In this action, McCorvey initially brought § 1983 claims against Officer Smith for false arrest and malicious prosecution based on this custodial arrest for failure to obey; however, those causes of action were dismissed under Rule 12(b)(6) via Order (doc. 22) entered on October 21, 2008. The October 21 Order concluded that Officer Smith was entitled to qualified immunity on both § 1983 claims relating to the custodial arrest because there was at least arguable probable cause for him to arrest and prosecute McCorvey for failure to obey. The claims related to that custodial

Based on these events, McCorvey filed suit against Officer Smith (solely in his individual capacity) in this District Court, alleging civil rights violations pursuant to 42 U.S.C. § 1983.  His only remaining cause of action is a § 1983 claim alleging false arrest and false imprisonment, amounting to a deprivation of McCorvey's Fourth Amendment rights, in connection with the detention described *supra*.  In his Rule 56 filings, defendant seeks qualified immunity on this claim because the detention of McCorvey on the evening of March 24, 2006 constituted a valid *Terry* stop that did not violate his constitutional rights.  Under a generous reading of his response, McCorvey contends that the initial detention was an arrest, not an investigatory stop, and that there was neither probable cause nor reasonable suspicion to justify that detention.[6]

## II.    Summary Judgment Standard.

Summary judgment should be granted only if "there is no genuine issue as to any material fact and ... the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The party seeking summary judgment bears "the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial."  *Clark v. Coats & Clark, Inc.,* 929 F.2d 604, 608 (11th Cir. 1991).  Once the moving party has satisfied its responsibility, the burden shifts to the nonmovant to show the existence of a genuine issue of material fact.  *Id.*  "If the nonmoving party fails to make 'a sufficient showing on an essential element of her case with respect to which she has the burden

---

arrest having been dismissed eight months ago, the Court will not address them (or the underlying facts on which they were predicated) further at this time.

[6]    Although he does address the initial stop, plaintiff devotes the lion's share of his summary judgment brief (doc. 37) to facts and arguments concerning the subsequent custodial arrest for failure to obey, including rehash of arguments that this Court previously considered and rejected at the Rule 12(b)(6) stage in dismissing claims relating to that custodial arrest.  By way of example, plaintiff argues that Officer Smith's directive that he move the car was unlawful because Alabama Code § 32-5A-136 "does not apply when the car is disabled."  (Doc. 41, at 4.)  But the Order entered on October 21, 2008 expressly rejected this contention and explained that it "fundamentally misreads the relevant statutory provisions."  (Doc. 22, at 8.)  Yet, in this instance and several others, plaintiff simply ignores the October 21 Order and reiterates the same theory on summary judgment.  Plaintiff does not advance his cause by repeating failed arguments pertaining to long-dismissed causes of action, without so much as acknowledging (much less offering any viable basis for reconsideration of) this Court's prior ruling to the contrary.

-5-

of proof,' the moving party is entitled to summary judgment." *Id.* (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)) (footnote omitted). "In reviewing whether the nonmoving party has met its burden, the court must stop short of weighing the evidence and making credibility determinations of the truth of the matter. Instead, the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Tipton v. Bergrohr GMBH-Siegen*, 965 F.2d 994, 999 (11ᵗʰ Cir. 1992) (internal citations and quotations omitted). "Summary judgment is justified only for those cases devoid of any need for factual determinations." *Offshore Aviation v. Transcon Lines, Inc.*, 831 F.2d 1013, 1016 (11ᵗʰ Cir. 1987) (citation omitted).

**III.    Analysis.**

   *A.      The Qualified Immunity Test.*

   When a government official is sued in his individual capacity for money damages for alleged civil rights violations, he may posit an affirmative defense of qualified immunity. *See Swint v. City of Wadley, Ala.*, 51 F.3d 988, 994 (11ᵗʰ Cir. 1995). The Supreme Court has held "that government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L. Ed.2d 396 (1982); *see also Bashir v. Rockdale County, Ga.*, 445 F.3d 1323, 1327 (11ᵗʰ Cir. 2006) ("Qualified immunity offers complete protection for government officials sued in their individual capacities as long as their conduct violates no clearly established statutory or constitutional rights of which a reasonable person would have known.") (citation and brackets omitted). "The purpose of this immunity is to allow government officials to carry out their discretionary duties without the fear of personal liability or harassing litigation." *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11ᵗʰ Cir. 2002) (citations omitted). As such, qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986).

   "To receive qualified immunity, the officer must first show that he acted within his discretionary authority." *Lewis v. City of West Palm Beach, Fla.*, 561 F.3d 1288, 1291 (11ᵗʰ Cir. 2009). If the defendant satisfies this burden, then "a plaintiff seeking to overcome the defendant's privilege of qualified immunity must show (1) that the officer violated her federal

constitutional or statutory rights, and (2) that those rights were clearly established at the time the officer acted." *Douglas Asphalt Co. v. Qore, Inc.*, 541 F.3d 1269, 1273 (11th Cir. 2008); *see also Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1264 (11th Cir. 2004) (similar).  Thus, once the discretionary authority prong is established, the qualified immunity analysis is a two-step process wherein the court "determines whether the officer's conduct amounted to a constitutional violation" and "analyzes whether the right violated was 'clearly established' at the time of the violation." *Lewis*, 561 F.3d at 1291; *see also Reams v. Irvin*, 561 F.3d 1258, 1263 (11th Cir. 2009); *Skop v. City of Atlanta, GA*, 485 F.3d 1130, 1137 (11th Cir. 2007).  Under present law, these two inquiries may be made in any order the court sees fit, as it is "not mandated that the Court examine the potential constitutional violation ... prior to analyzing whether the right was clearly established." *Lewis*, 561 F.3d at 1291.  "Whether a defendant is entitled to qualified immunity is determined using the version of facts most favorable to the plaintiff." *Reams*, 561 F.3d at 1260 n.1.

It is undisputed that Officer Smith, who at all relevant times was an on-duty police officer responding to a 9-1-1 call, acted within the scope of his discretionary authority during the events giving rise to plaintiff's remaining § 1983 cause of action.  Therefore, we turn to the next step of the qualified immunity analysis, by examining whether Officer Smith's conduct amounted to a constitutional violation.[7]  In this inquiry, the Court considers the version of the facts most favorable to McCorvey and draws all reasonable inferences in his favor.

**B.      Whether a Constitutional Violation Occurred.**

It is well established even a temporary investigatory stop of an individual, falling short of a traditional arrest, constitutes a seizure that triggers Fourth Amendment protections.  *See, e.g.,*

---

[7]      If the record were to establish that Officer Smith violated McCorvey's Fourth Amendment rights, either by conducting an investigatory stop without reasonable suspicion or by allowing that investigatory stop to mature into an arrest without probable cause, such conduct would implicate clearly established constitutional rights.  *See, e.g., Childs v. Dekalb County, Ga.*, 2008 WL 2787532, *8 (11th Cir. July 18, 2008) ("It has been clearly established since the Supreme Court decided *Terry* that an investigative stop - a seizure for Fourth Amendment purposes - performed without reasonable suspicion violates the Fourth Amendment."); *Thornton v. City of Macon*, 132 F.3d 1395, 1399 (11th Cir. 1998) ("It is clearly established that an arrest made without probable cause violates the Fourth Amendment.").

*United States v. Lopez-Garcia*, 565 F.3d 1306, 1313 (11ᵗʰ Cir. 2009) (temporary detention is a seizure within the meaning of the Fourth Amendment); *United States v. Lindsey*, 482 F.3d 1285, 1290 (11ᵗʰ Cir. 2007) (when a law enforcement officer performs a *Terry* stop, "the Fourth Amendment requires at least a minimal level of objective justification for making the stop") (citation omitted).  In evaluating the constitutionality of an investigatory stop, the Eleventh Circuit has applied a two-pronged inquiry, examining first "whether the officer's action was justified at its inception" by reasonable suspicion, and second "whether the stop went too far and matured into arrest before there was probable cause."  *United States v. Acosta*, 363 F.3d 1141, 1144-45 (11ᵗʰ Cir. 2004) (citation omitted); *see also United States v. Street*, 472 F.3d 1298, 1306 (11ᵗʰ Cir. 2006) ("our inquiry for examining whether an investigative stop is unreasonable under the Fourth Amendment ... is a dual one – whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place") (citation and internal quotation marks omitted).  Both parts of this test are at issue in this case.

    *1. Reasonable Suspicion for the Initial Stop/Detention.*

   When Officer Smith directed McCorvey to exit his vehicle and detained him in a patrol car, Officer Smith did not place him under arrest.  At least at its inception, the temporary detention of McCorvey was merely an investigatory stop (commonly known as a "*Terry* stop," in reference to *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)), not an arrest.  This distinction is important because warrantless arrests require probable cause, while investigatory stops are subject to the less stringent threshold of reasonable suspicion.[8]  A critical question, then, is whether the initial detention of McCorvey was supported by reasonable

---

   [8]  *See, e.g., Miller v. Harget*, 458 F.3d 1251, 1259 (11ᵗʰ Cir. 2006) (*Terry* stop "is reasonable under the Fourth Amendment if the officer's action is supported by reasonable suspicion to believe criminal activity may be afoot") (citations and internal quotation marks omitted); *Wood v. Kesler*, 323 F.3d 872, 878 (11ᵗʰ Cir. 2003) ("An arrest does not violate the Fourth Amendment if a police officer has probable cause for the arrest."); *United States v. Thompson*, 712 F.2d 1356, 1359 (11ᵗʰ Cir. 1983) ("[T]he Court has recognized a limited class of cases where the police-citizen encounter qualifies as a seizure within the Fourth Amendment but may be justified by less than probable cause.  *Terry*-type investigative stops satisfy Fourth Amendment strictures if the officer has an objective, reasonable suspicion of unlawful activity.").

suspicion to believe criminal activity might be afoot.  More precisely, because this issue is presented in the context of Officer Smith's qualified immunity defense, the analysis turns on whether there was arguable reasonable suspicion to support the initial stop and detention of McCorvey.  *See Jackson v. Sauls*, 206 F.3d 1156, 1166 (11th Cir. 2000) ("When an officer asserts qualified immunity, the issue is not whether reasonable suspicion existed in fact, but whether the officer had 'arguable' reasonable suspicion to support an investigatory stop.").

The Supreme Court has explained that "[a] determination that reasonable suspicion exists ... need not rule out the possibility of innocent conduct."  *United States v. Arvizu*, 534 U.S. 266, 277, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002); *see also United States v. Harris*, 526 F.3d 1334, 1337 (11th Cir. 2008) (reasonable suspicion "does not require officers to catch the suspect in a crime," and may be satisfied by officers "observing exclusively legal activity") (citation omitted).  What is required in the reasonable suspicion inquiry is that courts "look at the totality of the circumstances of each case to see whether the detaining officer has a particularized and objective basis for suspecting legal wrongdoing."  *Arvizu*, 534 U.S. at 273; *see also Miller v. Harget*, 458 F.3d 1251, 1259 (11th Cir. 2006) (same).  "The officer's reasonable suspicion must be based on specific articulable facts, together with rational inferences from those facts."  *United States v. Bautista-Silva*, --- F.3d ----, 2009 WL 1270350, *4 (11th Cir. May 11, 2009) (citation and internal quotation marks omitted); *see also Lopez-Garcia*, 565 F.3d at 1313 (similar).  In performing this inquiry, courts "may not consider each fact only in isolation, and reasonable suspicion may exist even if each fact alone is susceptible of innocent explanation."  *Bautista-Silva*, 2009 WL 1270350, at *4 (citation and internal quotation marks omitted).  "The determination of reasonable suspicion must be based on commonsense judgments and inferences about human behavior."  *United States v. Nunez*, 455 F.3d 1223, 1226 (11th Cir. 2006) (citation omitted).  That said, the reasonable suspicion standard is not satisfied by a mere "inchoate and unparticularized suspicion or hunch."  *Lindsey*, 482 F.3d at 1290 (citation omitted).

The specific, articulable, objective facts confronting Officer Smith on the evening in question were these: He was dispatched to a known high-crime area at approximately 9:30 p.m. in response to a 9-1-1 call that an unknown male was sitting in a car outside the caller's home.  Upon arrival, he observed a 1998 Chevrolet Lumina parked on the street near the 9-1-1 caller's home, with a male (McCorvey) sitting in the vehicle talking on a cell phone.  When approached,

McCorvey did not immediately explain to Officer Smith that the Lumina had broken down, that he lived four houses away, and that he was trying to contact his mechanic.  Instead, McCorvey produced an out-of-state driver's license, asked defensive questions about whether he was under arrest, and was generally uncooperative.  Whatever else can be said about them, these circumstances are suspicious.  A reasonable officer could easily surmise from those particularized and objective facts that criminal activity was or might be afoot.  While there may be (and, as it turns out, there were) perfectly lawful explanations for McCorvey's behavior, that is not the legal standard against which Officer Smith's conduct is judged.  Considering the totality of these suspicious circumstances, and taking the facts and reasonable inferences in the light most favorable to McCorvey, the Court finds that there was, at a minimum, arguable reasonable suspicion to justify the initial *Terry* stop and detention.  Plaintiff's summary judgment brief identifies neither facts nor authorities that might support a contrary result.

Accordingly, the Court finds as a matter of law that Officer Smith's stop and detention of McCorvey was at least arguably justified at its inception, such that Officer Smith is entitled to qualified immunity on plaintiff's claims that McCorvey's detention was unconstitutional from the outset.

### 2. *Investigatory Stop versus Arrest.*

Plaintiff's central ground for opposing qualified immunity on his § 1983 claim pertaining to the detention for license checks and so forth is that this seizure was tantamount to a warrantless arrest for which probable cause was lacking.  In that regard, plaintiff is certainly correct that "[a] warrantless arrest without probable cause violates the Constitution and provides a basis for a section 1983 claim."  *Case v. Eslinger*, 555 F.3d 1317, 1326 (11th Cir. 2009) (citation omitted).  Of course, "[p]robable cause to arrest exists when law enforcement officials have facts and circumstances within their knowledge sufficient to warrant a reasonable belief that the suspect had committed or was committing a crime."  *Skop*, 485 F.3d at 1137 (citation omitted).  On this record, defendant would be hard-pressed to show (and has not attempted to show) that "reasonable officers in the same circumstances and possessing the same knowledge as the Defendant could have believed that probable cause existed to arrest," which is the relevant inquiry for qualified immunity purposes in the Fourth Amendment arrest context.  *Case*, 555

F.3d at 1327 (citations omitted); *see also Skop*, 485 F.3d at 1137.[9]

The fundamental problem with plaintiff's argument is that he blithely assumes that the investigatory stop was an arrest, waving that threshold obstacle aside with a conclusory statement that "[t]here is no question that Plaintiff's initial seizure by Defendant was an arrest." (Doc. 41, at 6.)  He offers no facts, no law, and no argument to support or explain that conclusion.  As such, plaintiff's bare, unsupported contention that it is self-evident and obvious that the seizure was an arrest rather than a *Terry* stop unhelpfully glosses over a critical issue that lies at the heart of the qualified immunity analysis in this case.

"There is a difference between an investigative stop of limited duration for which reasonable suspicion is enough, and a detention that amounts to an arrest for which probable cause is required."  *Acosta*, 363 F.3d at 1145-46.  The Eleventh Circuit has opined that "[n]o brightline test separates an investigatory stop from an arrest.  Instead, whether a seizure has become too intrusive to be an investigatory stop and must be considered an arrest depends on the degree of intrusion, considering all the circumstances."  *United States v. Blackman*, 66 F.3d 1572, 1576 (11th Cir. 1995).  Officer Smith's directive that McCorvey exit his vehicle does not necessarily convert the stop into an arrest.  *See Courson v. McMillian*, 939 F.2d 1479, 1490 (11th Cir. 1991) ("it is clear that an investigative stop does not become an arrest merely because an officer directs the subject of an investigation out of a vehicle") (citation omitted).  The same goes for Officer Smith's alleged handcuffing of McCorvey before depositing him in the patrol car.  *See Acosta*, 363 F.3d at 1147 ("an investigatory stop does not necessarily ripen into an arrest because an officer ... handcuffs a suspect"); *Blackman*, 66 F.3d at 1576 ("this Court has said the fact that police handcuff the person ... does not, as a matter of course, transform an investigatory stop into an arrest").

To trace out the line of demarcation separating *Terry* stops from traditional arrests, the

---

[9]     In that regard, it bears noting that Officer Smith testified that at the time of the stop, he "didn't know if a crime had already been committed or [he] didn't know if [McCorvey's] intent was to commit a crime."  (Smith Dep., at 10.)  Such lack of awareness of any wrongdoing is difficult to reconcile with notions of probable cause.  Viewing the record in the light most favorable to plaintiff, Officer Smith simply did not possess enough facts at that time to form any reasonable belief that probable cause existed to arrest McCorvey.

-11-

Eleventh Circuit has promulgated a nonexclusive list of factors, including the following: "(1) the law enforcement purpose served by the detention; (2) the diligence with which the officers pursued the investigation; (3) the scope and intrusiveness of the investigation; and (4) the duration of the detention." *Street*, 472 F.3d at 1306; *see also Acosta*, 363 F.3d at 1146.  In applying these factors, courts focus on "whether the police diligently pursued a means of investigation likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant." *Street*, 472 F.3d at 1306 (citations omitted). Notwithstanding these enumerated criteria, "the totality of the circumstances determines when an encounter has become too intrusive to be classified as a seizure and has become an arrest, requiring probable cause." *Courson*, 939 F.2d at 1492.

With respect to the first factor, the record establishes that Officer Smith had a valid law enforcement purpose for detaining McCorvey.  In particular, Officer Smith had good reason to ascertain who McCorvey was and what he was doing sitting in a parked car outside the 9-1-1 caller's residence in the late evening hours in a neighborhood afflicted by crime.  The record reflects that Officer Smith diligently pursued these inquiries throughout the period of McCorvey's detention via methodologies that were likely to confirm or dispel his suspicions quickly (*i.e.*, running a license check on the car's occupant, running a tag check on the vehicle, having Officer Tolbert go to McCorvey's house and summon the car's owner to the scene), then released McCorvey promptly thereafter. Nothing about the law enforcement purposes served by McCorvey's detention suggest that it was or became an arrest for which probable cause was necessary.

The second factor concerns the diligence with which Officer Smith pursued his investigation.  The *Acosta* court concluded that this criterion was indicative of an investigatory stop, rather than an arrest, where "[n]othing in the record indicates that the police were less than prompt in carrying out their on-the-scene investigation.  Each investigatory act logically led to the next act which was done without delay." 363 F.3d at 1146.  The same can be said here. There is no evidence of unnecessary delay during McCorvey's detention.  To the contrary, the record shows that Officer Smith ran a driver's license check on McCorvey, which revealed no outstanding warrants.  Officer Smith then ran a check of the Lumina's license plate, which revealed that it was owned by a woman who lived just down the street.  On that basis, Officer

Smith sent his backup officer, Officer Tolbert, down to the house to retrieve Stewart, which he did. Upon Stewart's arrival on the scene and confirmation that the Lumina was her vehicle and that McCorvey was her husband, the detention was promptly terminated. There is neither evidence nor accusation of dilatory conduct or unjustified pauses by Officer Smith during this process; therefore, this factor supports a finding that the seizure did not exceed the bounds of reasonableness and become an arrest.

The third factor is "whether the scope and intrusiveness of the detention exceeded the amount reasonably needed by police to ensure their personal safety." *Acosta*, 363 F.3d at 1146. Here, of course, the facts viewed in the light most favorable to plaintiff are that Officer Smith handcuffed McCorvey and placed him in his patrol vehicle. Such treatment has been characterized as "a severe form of intrusion." *United States v. Gil*, 204 F.3d 1347, 1351 (11th Cir. 2000). But it is not *per se* unreasonable. To the contrary, the law is clear that "during an investigatory stop, an officer can still handcuff a detainee when the officer reasonably believes that the detainee presents a potential threat to safety." *Gray ex rel. Alexander v. Bostic*, 458 F.3d 1295, 1305-06 (11th Cir. 2006); *see also Blackman*, 66 F.3d at 1576 (fact that officers called suspects out of apartment and handcuffed them when they emerged did not alter character of investigatory stop, inasmuch as "[c]aution was called for even at the investigatory stage"). Under the specific circumstances presented here, a law enforcement officer could conclude that handcuffing McCorvey and placing him in a patrol vehicle was reasonably necessary to protect the safety of the investigating officers because (1) McCorvey's vehicle had not been searched, (2) it was late at night in an area frequently targeted by criminals, (3) McCorvey had not explained what he was doing there, and (4) McCorvey had exhibited uncooperativeness and defensiveness. Under the circumstances, the Court will not second-guess the propriety of Officer Smith's precautionary act of handcuffing McCorvey and placing him in the patrol car while conducting his investigation. *See generally Acosta*, 363 F.3d at 1146-47 (where officers possess an articulable and reasonable belief that the subject is potentially dangerous, they may take reasonable steps to ensure their safety).

With respect to the fourth element, on its face the approximately 40-minute duration of McCorvey's detention may seem excessive. But the Eleventh Circuit has approved similar or even longer detentions, reasoning that "our cases impose no rigid time limitation on *Terry* stops.

-13-

... [I]n evaluating whether an investigative detention is unreasonable, common sense and ordinary human experience must govern over rigid criteria." *Street*, 472 F.3d at 1307 (citation omitted) (60-minute duration of stop did not transform investigative detention into arrest).[10] Officer Smith was not idle during this 40-minute stretch; to the contrary, as McCorvey put it, Officer Smith "did a lot of things" during that time period. (McCorvey Dep., at 83.) He ran a license check on McCorvey, and subsequently ran a tag check on the Lumina. Such checks, which were manifestly reasonable under the circumstances, take time, and are not instantaneous processes. When his backup, Officer Tolbert, arrived 20 minutes later (according to McCorvey), Officer Smith briefed him on the situation. Upon learning that the owner of the Lumina lived several houses down the street, the officers reasonably decided that Officer Tolbert would go speak with her to see whether she could shed light on these suspicious circumstances. This process also took time, as Officer Tolbert had to go to the house, explain the situation to Stewart, wait for her to get ready, and bring her back to the scene. Once Stewart arrived and corroborated her husband's story, Officer Smith released McCorvey. Considering these circumstances in the aggregate, common sense and ordinary human experience strongly support the conclusion that (viewing the facts in the light most favorable to McCorvey) the 40-minute duration of the detention was neither excessive nor unreasonable in relation to the purpose of the stop. Therefore, the Court finds that the duration of the investigatory stop did not convert it into a full-blown arrest for which probable cause was required.

　　　　Considering both the non-exhaustive four-factor test espoused by the Eleventh Circuit and all other surrounding circumstances in the light most favorable to the non-movant, the undersigned is of the opinion that the initial detention of McCorvey did not mature into a *de facto* arrest without probable cause. Simply put, that detention served a valid law enforcement purpose, Officer Smith investigated the matter diligently, the intrusiveness of the detention was

---

[10]　　　*See also Acosta*, 363 F.3d at 1148 ("Considering the circumstances, and in light of existing precedent, thirty minutes was a reasonable duration for this *Terry* stop."); *Gil*, 204 F.3d at 1350-51 (detention of suspect in handcuffs in police car for 75 minutes held not unreasonable under the circumstances); *Courson*, 939 F.2d at 1491-92 (explaining that reasonableness of duration of investigative stop cannot be delineated by bright-line rule, but that 30-minute detention was reasonable where officer spent majority of time awaiting assistance).

justified by reasonable safety considerations, and the entire episode lasted no longer than reasonably necessary to allow Officers Smith and Tolbert to ascertain that McCorvey had a lawful reason to be sitting in a parked car at night near the home of a stranger.  Officer Smith diligently pursued means of investigation likely to confirm or dispel his suspicions quickly, during which time it was reasonably necessary to detain McCorvey.  As such, reasonable officers in defendant's circumstances could have believed that there was no incursion on plaintiff's Fourth Amendment rights during that detention, and that probable cause was not required.

Because Officer Smith's conduct did not amount to a constitutional violation, either at the inception of the *Terry* stop or during the course of that detention, the Court finds as a matter of law that Officer Smith is entitled to qualified immunity on plaintiff's § 1983 false arrest claim, which is the sole remaining cause of action herein.[11]

---

[11]        In so concluding, the Court does not credit plaintiff's efforts to inject state-law concepts into the federal qualified immunity analysis.  For example, plaintiff maintains in his summary judgment brief that Officer Smith behaved willfully, maliciously and in bad faith, such that he would not be entitled to peace officer immunity under Alabama law (presumably referring to Alabama Code § 6-5-338(a)).  But whether Officer Smith would or would not be entitled to immunity under Alabama law is not relevant because McCorvey has asserted no state-law causes of action.  Moreover, the analyses for federal qualified immunity and Alabama discretionary function immunity are distinct.  *See, e.g., Scarborough v. Myles*, 245 F.3d 1299, 1303 n.9 (11th Cir. 2001) ("We also have found federal qualified immunity to be more inclusive than Alabama discretionary-function immunity."); *Sheth v. Webster*, 145 F.3d 1231, 1240 n.8 (11th Cir. 1998) ("We do not suggest that entitlement to qualified immunity under federal law will always entitle a defendant to discretionary function immunity.  Qualified immunity under federal law would not necessarily be defeated by willfulness, malice or bad faith."); *Phillips v. Irvin*, 2006 WL 1663677, *19 n.49 (S.D. Ala. June 14, 2006) ("Qualified immunity under federal law and state-function immunity under Alabama law are neither synonymous nor co-extensive").  The Court therefore resists plaintiff's efforts to conflate these two separate doctrines for summary judgment purposes.  Additionally, the Court neither adopts nor considers plaintiff's discussion of whether he might have valid state-law tort claims against Officer Smith for false imprisonment or false arrest.  *See generally Hilliard v. City and County of Denver*, 930 F.2d 1516, 1521 (10th Cir. 1991) ("we note the danger of confusing the question of whether the plaintiff has state tort remedies with whether the plaintiff has stated a claim amounting to the deprivation of a constitutional right").  No such state-law causes of action having been brought herein, plaintiff cannot *de facto* amend his pleadings via summary judgment brief.  *See Gilmour v. Gates, McDonald and Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004) ("A plaintiff may not amend her complaint through argument in a brief opposing summary judgment."); *Bill Salter Advertising, Inc. v. City of Brewton, Ala.*, 2008 WL 183237, *5 n.14 (S.D. Ala. Jan. 18, 2008)

**IV.     Conclusion.**

For all of the foregoing reasons, the Court finds that there are no genuine issues of material fact and that defendant is entitled to judgment in his favor as a matter of law on the ground of qualified immunity.  As such, the Motion for Summary Judgment (doc. 36) is **granted**, and plaintiff's claims are **dismissed with prejudice**.  A separate judgment will enter.

DONE and ORDERED this 30th day of June, 2009.

s/ WILLIAM H. STEELE _____
UNITED STATES DISTRICT JUDGE

_____

("It is improper for a party to use summary judgment briefs to effect a *de facto* amendment of its pleadings to assert new causes of action.").